# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## HUNTINGTON

**PERRY STERLING SHAFFER,**

   **Plaintiff,**

**v.**          **CIVIL ACTION NO. 3:17-cv-00722**

**NANCY A. BERRYHILL,**
**Acting Commissioner of Social Security,**

   **Defendant.**

## <u>PROPOSED FINDINGS AND RECOMMENDATION</u>

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. § 1381-1383f. Presently pending before this Court are Plaintiff's Brief in Support of Judgment on the Pleadings (ECF No. 16), Brief in Support of Defendant's Decision (ECF No. 17) and Plaintiff's Reply to Defendant's Brief in Support of Defendant's Decision (ECF No. 18).

Perry Sterling Shaffer, Claimant, filed an application for SSI on October 18, 2012. Claimant alleged disability beginning April 15, 2011. The claim was denied initially on March 28, 2013, and upon reconsideration on December 11, 2013. Thereafter, Claimant filed a written request for hearing on December 18, 2013. On August 5, 2015, a hearing was held before an Administrative Law Judge (ALJ) in Huntington, West Virginia. By decision dated September 23, 2015, the ALJ determined that Claimant was not entitled to benefits. Claimant sought review by the Appeals Counsel of the ALJ's unfavorable decision. On November 10, 2015, the AC notified Claimant that his request for review was denied (Tr. at 1-4).

On January 20, 2017, Claimant filed a complaint with this Court pursuant to 42 U.S.C. § 405(g) (ECF No. 2). On February 28, 2018, the undersigned entered Proposed Findings and Recommendation (ECF No. 19). On March 16, 2018, Defendant filed Objections to the Magistrate Judge's Proposed Findings and Recommendation (ECF No. 20). On March 29, 2018, the District Judge entered a Memorandum Opinion and Order rejecting the Proposed Findings and Recommendation and remanding this case to the undersigned for further proceedings consistent with the Memorandum Opinion and Order[1] (ECF No. 21). On March 29, 2018, Plaintiff filed a Response to Defendant's Objections to the Magistrate Judge's Proposed Findings and Recommendation (ECF No. 22).

<u>Standard of Review</u>

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability. *See Blalock v. Richardson*, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 404.1520 (2017). If an individual is found "not disabled" at any step, further inquiry is unnecessary. *Id.* § 404.1520(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. *Id.* § 404.1520(c). If a severe impairment is present, the third inquiry is whether such impairment

---

[1] The Memorandum Opinion and Order directs the undersigned to consider and resolve Plaintiff's claims that (1) the ALJ erred by failing to properly assess Plaintiff's impairment of obesity at all steps of the sequential evaluation and (2) the ALJ erred by failing to perform the required function-by-function analysis when determining Plaintiff's RFC (ECF No. 21).

meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. *Id.* § 404.1520(d). If it does, the claimant is found disabled and awarded benefits. *Id.* If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(e). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. *Hall v. Harris,* 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. § 404.1520(f) (2017). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

   In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he has not engaged in substantial gainful activity since the application date of October 18, 2012 (Tr. at 57). Under the second inquiry, the ALJ found that Claimant suffers from the following severe impairments: degenerative disc disease, obesity, asthma, hypertension, degenerative joint disease, congestive heart failure, depression and sleep apnea. (*Id.*) At the third inquiry, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled the level of severity of any listing in Appendix 1 (Tr. at 58). The ALJ then found that Claimant has a residual functional capacity to perform work at the light exertional level[2]

---

[2] Claimant can perform light work as defined in the regulations except stand/walk for two hours out of an eight-hour workday. Claimant can occasionally climb ramps and stairs, but never climb ladders, ropes and scaffolds. Claimant can occasionally stoop, kneel, balance, crouch and crawl. Claimant must avoid concentrated exposure to temperature extremes, pulmonary irritants and hazards. Claimant can have occasional interaction with others. Claimant can

(Tr. at 61).    The ALJ held that Claimant is unable to perform any past relevant work (Tr. at 66).

The ALJ found that considering Claimant's age, education, work experience and residual

functional capacity, there are jobs that exist in significant numbers in the national economy that

Claimant can perform (Tr. at 66-67).  The ALJ held that Claimant could perform jobs such as: a

table worker, sorter and a final assembler (Tr. at 67).  Therefore, the ALJ concluded that Claimant

was not disabled (Tr. at 68).

Scope of Review

The sole issue before this court is whether the final decision of the Commissioner denying

the claim is supported by substantial evidence.  In *Blalock v. Richardson*, substantial evidence was

defined as:

> Evidence which a reasoning mind would accept as sufficient to
> support a particular conclusion. It consists of more than a mere
> scintilla of evidence but may be somewhat less than a
> preponderance. If there is evidence to justify a refusal to direct a
> verdict were the case before a jury, then there is "substantial
> evidence."

*Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (quoting *Laws v. Celebrezze*, 368 F.2d

640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving

conflicts in the evidence.  *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir. 1990).  Nevertheless,

the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize

the record as a whole to determine whether the conclusions reached are rational."  *Oppenheim v.*

*Finch*, 495 F.2d 396, 397 (4th Cir. 1974).

A further review of the record reveals the decision of the Commissioner in this case is

supported by substantial evidence.

---

understand, remember and carry out simple instructions, with occasional changes in a work setting.  Claimant can
occasionally reach overhead with the left arm. Claimant can frequently reach in all other directions with the left arm
(Tr. at 61).

Claimant's Background

Claimant was born on August 13, 1968.  He has a 12th grade education (Tr. at 80).  He does not have a driver's license.  (*Id.*)  Claimant lives with his mother (Tr. at 91).

Physical Medical Record

On May 10, 2012, Claimant visited the emergency room at University Medical Center in Las Vegas, Nevada, complaining of chest pain (Tr. at 334).  A physical examination revealed that his lungs were clear to auscultation, with non-labored breathing;  no wheezes, rales, rhonchi, or stridor (Tr. at 335).  A musculoskeletal examination revealed that his motor  strength was 5/5 in the upper and lower extremities bilaterally, with no swelling. A chest x-ray showed moderate cardiomegaly.  Claimant was to be admitted to the chest pain center. (*Id.*)  On September 13, 2014, an MRI was performed of Claimant's lumbar spine due to his history of back pain, radiculopathy and bilateral leg numbness.  The MRI showed normal vertebral height and alignment, no  spinal stenosis and no lumbar disc herniation (Tr. at 641).

On September 24, 2013, David Mumford, M.D., performed a comprehensive internal medicine  evaluation of Claimant (Tr. at 376-382).  Claimant indicated that he had low back pain but had not been treated for it; had been diagnosed  with asthma and bronchitis; had knee pain that had not been diagnosed; and had chest pain  evaluated in 2012 but was not told he had a cardiac condition (Tr. at 376). Dr. Mumford noted that Claimant was morbidly obese, but that his movements were normal and he did not use an assistive device for ambulation (Tr. at 377). Claimant avoided bending at the waist because of body habitus, but he was able  to sit up from a lying position with legs fully extended and get on and off the exam table with a footstool. (*Id.*)

Examination of Claimant's neck revealed that the thyroid was not palpable; there was good carotid upstroke;  and ranges of motion were within normal limits, with no evidence of pain on movement or paravertebral  muscle spasm (Tr. at  378). Examination of his chest/lungs revealed respiratory auscultation with normal  excursions and no appreciable wheezing, rhonchi or rubs.  A cardiovascular examination revealed  that the precordium was quiet without appreciable lifts, regular rate and rhythm with normal S1 and S2 and  no murmurs. (*Id.*) A musculoskeletal examination revealed normal shoulders, hands, hips, knees and  feet. The bilateral extremities showed evidence of venous stasis and range of motion was within  normal limits for both the upper and lower extremities. (*Id.*)  An examination of Claimant's back indicated evidence of  significant kyphosis, lordosis  or  noticeable  scoliosis;  palpation  along  the paravertebral area  did not elicit complaints of pain; range of motion appeared to be within normal limits; sitting straight-leg  raising was normal; and supine straight leg-raising was normal. (*Id.*)  Claimant was not able to sit up from  a lying position with legs fully extended due to morbid obesity, however he was able to perform a squat.  A  neurological examination revealed that cranial nerves were within normal limits.  His motor strength was graded to be normal at 5/5, muscle tone and bulk were normal and there was no evidence of tremor or fasciculation of  the upper or lower extremities, reflexes were absent, there was no imbalance with bending or twisting, and gait and station were within normal limits (Tr. at 379).  Claimant did not use an  assistive device for ambulation.  His tandem walk was normal, toe walk was normal, heel walk was normal and light touch was intact in the upper and lower extremities bilaterally. (*Id.*)

Claimant's subjective complaints were considered by Dr. Mumford in the context of his clinical findings (Tr. at 379-380).  Despite complaints of low back pain, a physical examination revealed no objective evidence of  any significant mechanical problem affecting the lumbar

spine; and there was no lumbar radiculopathy (Tr. at 379). Dr. Mumford's diagnosis was chronic low back pain most likely related to morbid obesity. (*Id.*) Claimant had reported that he had been diagnosed with asthma and bronchitis, however, a physical examination showed no evidence of chronic cough, audible wheezing or use of accessory muscles of respiration (Tr. at 379). Claimant's chest was clear and pulmonary function studies done on the day of the examination were essentially normal (Tr. at 379-380). The diagnosis was subjective history of asthma currently asymptomatic (Tr. at 380).

Claimant complained of knee pain, however there was no evidence of any acute or chronic arthritic condition. Range of motion of both knees was normal. (*Id.*) Dr. Mumford's diagnosis was arthralgias affecting both knees, with the possibility of degenerative joint disease (Tr. at 380). Dr. Mumford also considered Claimant's complaints of occasional chest pain. He noted that Claimant had been evaluated for this with no cardiac diagnosis and his cardiac examination was normal. The diagnosis was chest pain of non-cardiac etiology (Tr. at 380). Dr. Mumford performed a functional capacity assessment, basing it mostly on Claimant's morbid obesity. (*Id.*) Dr. Mumford found that Claimant could lift and/or carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk for 4 hours in an 8 hour workday without the need for an assistive device, and sit for 8 hours in an 8 hour workday. Dr. Mumford opined that if Claimant needed to alternate sitting and standing, standard breaks and a lunch period would provide sufficient relief (Tr. at 380). With respect to postural maneuvers, Dr. Mumford found that Claimant could climb ramps/chairs, balance, stoop/bend, kneel, crouch/squat, and crawl occasionally; and that he could never climb ladders/scaffolds (Tr. at 381). Dr. Mumford identified environmental restrictions regarding exposure to heights, moving machinery, chemicals, and dust. (*Id.*)

On October 15, 2013, Jeffrey Wheeler, M.D., a state agency physician, performed a physical RFC assessment based on his review of the record (Tr. at 127-130). Dr. Wheeler found that Claimant could lift and/or carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk for a total of 2 hours in an 8 hour workday, sit for a total of about 6 hours in an 8 hour workday, and push and/or pull without limitation other than shown for his ability to lift and/or carry (Tr. at 120). Dr. Wheeler also found that Claimant could climb ramps/stairs, balance, stoop, kneel, crouch, and crawl occasionally; never climb ladders/ropes/scaffolds; and would need to avoid concentrated exposure to extreme cold and heat, fumes, odors, dusts, gases, poor ventilation, and hazards such as machinery and heights (Tr. at 128-129). Dr. Wheeler noted that Claimant's obesity was a severe medically determinable impairment that he considered along with his other impairments, both severe and nonsevere, in reducing his RFC to light exertion (Tr. at 129).

On November 14, 2013, Claimant underwent x-rays of the lumbar spine which revealed that vertebral body heights, intervertebral disc spaces and posterior alignment were maintained (Tr. at 602). There was no evidence of spondylosis, spondylolisthesis or significant facet arthropathy. On November 22, 2013, x-rays of the Claimant's left knee were unremarkable (Tr. at 456).

On March 27, 2014, x-rays of the lumbar spine were performed and found unremarkable; vertebral bodies and disc spaces were adequately maintained, neural foramina and facet joints were unremarkable, vertebral pedicles and lamina were unremarkable, traverse and spinous process were unremarkable, there was no suggestion of spondylosis or spondylolisthesis, and no fracture or destructive process was seen (Tr. at 446).

The record contains progress notes from Dr. Randal Hawkins from the time period from April 2014 through May 2015 (Tr. at 468-588). During this time, Claimant saw Dr. Hawkins for sleep apnea, mononeuritis, rash, infected toenail, back pain, leg pain, left shoulder pain, chest pain, leg edema, pancreatitis, left knee pain, melanoma, medication review, shortness of breath, upper respiratory infection, depression, and rectal bleeding (Tr. at 470, 472, 476, 480, 487, 495, 499, 503, 511, 515, 523, 527, 532, 536, 544, 551, 557, 563, 569, 575, 581, 585).

On October 15, 2014, Dr. Hawkins performed an echocardiogram on Claimant for complaints of chest pain (Tr. at 742). Upon review of the test results, Dr. Hawkins opined that there was no obvious reason for Claimant's chest pain and that Claimant had minimal tricuspid regurgitation (Tr. at 742-743). On October 16, 2014, Dr. Hawkins wrote a one-sentence note on his prescription pad stating, "[u]nable to work due to medical issues (Tr. 458).

<u>Mental Medical Record</u>

On September 24, 2013, Dr. Mumford performed a comprehensive Internal Medicine Evaluation of Claimant that revealed sensorium was clear and alert (Tr. at 377). He was oriented to person, place, time, and the purpose of the evaluation (Tr. at 378). His immediate memory was not impaired, his recent memory was intact, with the ability to recall what he did that morning and his remote memory was intact as he was able to recall past personal events. (*Id.*)

Carey E. Herdman, a Licensed Professional Counselor, saw Claimant six times, on February 28, 2014, March 10, 2014, March 27, 2014, April 8, 2014, April 29, 2014, and May 14, 2014 (Tr. at 392-397). On October 23, 2014, Ms. Herdman completed a mental RFC assessment (Tr. at 461-462). Ms. Herdman checked the blocks indicating that Claimant had

no limitations regarding understanding and memory (Tr. at 461). In assessing Claimant's ability to sustain concentration and persistence, Ms. Herdman found no limitations regarding Claimant's ability to sustain an ordinary routine without special supervision; mild limitations in his ability to carry out very short and simple instructions; mild limitations in his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and moderate limitations in his ability to carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with or in proximity to others without being distracted by them, make simple work-related decisions and complete a normal 8-hour workday without an unreasonable number and length of rest periods (Tr. at 461). With regards to social interaction, Ms. Herdman checked the blocks indicating that Claimant had no limitations in his ability to ask simple questions or request assistance, get along with co-workers or peers without distracting them or exhibiting behavioral extremes, and maintain socially appropriate behavior and adhere to basic demands of neatness and cleanliness; mild limitations in his ability to interact appropriately with the general public; and moderate limitations in his ability to accept instructions and respond appropriately to criticism from supervisors. (*Id.*) With regards to adaptation, Ms. Herdman checked the blocks indicating that Claimant had no restrictions in his ability to be aware of normal hazards and take appropriate precautions, travel in unfamiliar places or use public transportation, set realistic goals or make plans independently of others; and mild limitations in his ability to respond appropriately to changes in the work setting. (*Id.*) Based on Claimant's functioning and symptoms, Ms. Herdman concluded that full-time employment would be "very difficult" (Tr. at 460).

10

Claimant began treatment for "stress and depression" in February 2014, associated with the death of his life partner of 24 years, who had died the previous year (Tr. at 392, 398, 404). On March 27, 2014, Marc Spelar, M.D., performed a psychiatric evaluation (Tr. at 398-403). Claimant reported that he had been unemployed and was applying for disability benefits at the suggestion of one of his physicians (Tr. at 399). A mental status examination of Claimant revealed that his attitude was cooperative; his motor activity was within normal limits; his speech/language was normal; his affect was appropriate but constricted; his thought processes were goal directed, logical, and relevant; his thought content was appropriate; and his recent, remote, and immediate memory, concentration and calculation, insight, and judgment were intact (Tr. at 400).

Dr. Spelar's diagnosis of Claimant was major depressive disorder, single episode, severe without psychotic features (Tr. at 400). Dr. Spelar assessed a GAF of 55 (Tr. at 401). Dr. Spelar recommended that Claimant continue therapy with Carey Herdman, LPC, a counselor (Tr. at 402).

<u>Claimant's Testimony</u>

Claimant testified that he had started having medical issues about two years before the onset date he alleged (April 15, 2011) (Tr. at 81). He stated that he had last worked two years prior to April 2011, as a shampoo porter. He stated that job involved pushing a 660 pound machine that cleaned carpets (Tr. at 82). Claimant testified that he lifted over fifty pounds doing the job. Claimant stated that he had also worked as a customer service representative at a 99 Cents store briefly, and he had also been self-employed helping his mom and dad run a small store and a Mexican food restaurant (Tr. at 82-83). He stated that when helping run the store/restaurant he did some cooking, some stocking and some deliveries, lifting

11

up to about twenty pounds (Tr. at 83-84).

Claimant testified that he could not work because his right arm and right leg both went numb and both of his feet and legs swelled so bad that he sometimes could not put on his shoes (Tr. at 84). He stated that his feet were hurting even sitting at the hearing and that the bottom of his legs swelled so bad that he got compression lesions on both legs (Tr. at 84). Claimant stated that his doctors had told him that he had a pinched nerve under his left arm that was putting pressure on his main blood vessel and that his weight was causing problems too (Tr. at 84-85). He testified that his doctors wanted him to go through physical therapy for a year, but his insurance would not pay for it (Tr. at 85). He stated that the only treatment he was getting was medication (Tr. at 85). He testified that the medication he took caused him to get dizzy, have chest pains, get lightheaded, have memory problems, and have a dry mouth (Tr. at 85).

Claimant testified that he was last hospitalized the prior December for four days due to pains in his lower abdomen (Tr. at 86). He stated that his symptoms were determined to be due to stress and medications that needed to be adjusted, and "probably my weight too." He testified that he was six feet tall and weighed four hundred ten pounds; he stated that he weighed one hundred ten pounds less than that a couple of years earlier. (*Id.*) He attributed his weight gain to problems walking. (*Id.*)

Claimant testified that he could walk about thirty-five feet before his feet started hurting. (*Id.*) He stated that the cane he had with him was not prescribed and that normally he wore a custom made leg brace, but it had broken three weeks earlier and a new one had been ordered, but not received; his doctor told him to get and use a cane until he got the new brace (Tr. at 87). He stated he liked using the brace better than the cane. Claimant testified that

he could stand for twenty minutes and sit for twenty minutes. (*Id.*) He estimated he could lift ten pounds using both of his arms (Tr. at 88).

Claimant testified that his left arm went numb at night and his left leg was numb all the time due to his pinched nerve (Tr. at 88-89). He stated that his right leg started going numb, too, after an hour or hour and a half (Tr. at 89).

Claimant testified that heat, cold, and pollen made his asthma and bronchitis worse (Tr. at 88). He stated that bleach and strong chemicals aggravated his sinuses and that he was allergic to cats, dogs, and dust (Tr. at 92). He stated that scents and perfumes bothered him and that he could not have fabric softener sheets used on his clothing. (*Id.*) He stated that hot and cold weather bothered his asthma and he used an inhaler as needed, especially when he had to go up and down stairs (Tr. at 93). He stated that he used a nebulizer twice a day – when he got up and before he went to bed (Tr. at 93-94). He stated that he also had an epi pen for any time he could not breathe at all (Tr. at 93).

Claimant testified that he spent a normal day sitting in a chair watching TV (Tr. at 89). He stated that he did not have a favorite show he liked to watch and that he could follow what he was watching unless he fell asleep. (*Id.*) He stated that he could take care of his personal hygiene except that sometimes he could not get his shoes on due to his feet swelling and it takes him a long time to get dressed, also due to swelling (Tr. at 89-90). He stated he was prescribed water pills and took them, but they did not help (Tr. at 90).

Claimant testified that he used a CPAP for his sleep apnea, but his doctors were going to change him over to a BiPAP because his sleep apnea was so bad that he needed a high pressure and if they adjusted the mask tight enough that it did not leak air it gave him a headache (Tr. at 90). He stated that he fought with the CPAP a lot, but he thought it was helping

him sleep more (Tr. at 90-91).  He noted that he was in bed for twelve hours and woke up "100 times a night" but thought he was getting eight hours of sleep (Tr. at 91).

Claimant stated that he did not belong to any social groups where he would attend and interact with other people. He stated that his sister and his mom visited him, but he did not have any friends. He said at the time of the hearing he was living with his mom, and noted that he did not help with housework or yard work. (*Id.*) He stated that he did put his dishes in the sink, could fry an egg, and could make a bowl of cereal (Tr. at 92). He stated that his mother did his laundry.  (*Id.*)

Claimant stated that he was going to Prestera once or twice a month, noting that he lived a long way into the mountains and it was hard for him to get there (Tr. at 94). He stated that the treatment he received made him feel better and noted that his doctor had told him he needed to go there.  He stated that he had problems going out, got stressed and cried, and had problems making himself get out of bed in the morning. (*Id.*)

Claimant testified that he had to take a two hour nap every day "because I – I stay so tired" (Tr. at 95). He stated that he had psoriasis and had flare ups all the time, meaning that he had a place somewhere on his body with psoriasis all the time (Tr. at 95-96). He stated he usually had it between his legs, used a cream but that did n o t clear it, noting that it w o u l d bleed, try to heal, but not completely go away (Tr. at 96). He stated that there were places where the psoriasis got a crust on it and then cracked.  He noted that he had it on his chest at the time of the hearing. (*Id.*) He stated that he also had big brown spots on his legs but those were lesions due to his legs swelling (Tr. at 97).

Claimant testified that he also got migraine headaches once or twice a month and had lower level headaches once a week (Tr. at 98). He stated that he did not know what

14

triggered the headaches or migraines, but to recover he needed to go somewhere it was completely quiet and wait for it to pass. (*Id.*) He stated he usually took three or four over-the-counter Aleve tablets for the headaches and they passed in an hour or two (Tr. at 98-99). He stated that he got dizzy when he went up and down stairs and doctors think the dizziness is from his medications (Tr. at 98).

Claimant stated that elevating his legs seemed to be the best way to relieve swelling in his legs and said that Dr. Hawkins advised him to keep his legs up any time he was sitting down, which is what he did (Tr. at 99). He estimated that he spent ten to eleven hours a day sitting with his legs up. (*Id.*)

<u>Vocational Expert's Testimony</u>

A vocational expert (VE) described Claimant's past relevant work as follows: carpet cleaner—medium and skilled as generally performed, and very heavy as actually performed; combined job of cook—medium and skilled, and delivery driver—medium and unskilled; and kitchen helper—medium and unskilled as generally performed, and light as actually performed (Tr. at 101).

The ALJ asked the VE to assume that a hypothetical individual would be limited to light work with the ability to stand and walk for two hours in an eight-hour workday (Tr. at 101). The ALJ also asked the VE to assume that the individual could occasionally climb ramps or stairs but never climb ladders, ropes, or scaffolds; could occasionally balance, stoop, kneel, crouch, and crawl; would need to avoid concentrated exposure to temperature extremes, pulmonary irritants, and hazards; and could understand, remember, and carry out simple instructions, with occasional changes in the work setting and occasional interaction with others. (*Id.*) The VE testified that the individual could not perform any of Claimant's past relevant

15

work  but would be able to perform a reduced range of sedentary work including the jobs of

cable worker, sorter  and final assembler (Tr. at 102).  The ALJ asked the VE to further assume

that the individual would be limited  to reaching overhead occasionally and in all other directions

frequently with the left arm.  (*Id.*)  The VE  testified that those additional limitations would have

no impact on the individual's ability to perform the jobs  identified.  (*Id.*)

Claimant's Challenges to the Commissioner's Decision

Claimant argues that the ALJ erred by failing to properly assess Claimant's impairment of

obesity at all steps of the sequential evaluation.  Claimant asserts that the ALJ erred by failing to

perform the required function-by-function analysis when determining Claimant's residual

functional capacity (RFC) (ECF Nos. 16, 18).   In response, Defendant asserts that the ALJ

adequately complied with Social Security Ruling 02-01p in addressing Claimant's obesity (ECF

No. 17).  Additionally, Defendant avers that the ALJ satisfied the requirement for a function-by-

function assessment.

Discussion

Claimant argues that the ALJ did not mention obesity or SSR 02-1p "at all at step three"

(ECF No. 16).  At step three of the sequential evaluation process the  ALJ  held that Claimant's

obesity was considered in relation to Listing Section 1.00 dealing with the musculoskeletal

system  (Tr. at 59).  The ALJ considered Claimant's obesity in the discussion of Claimant's

impairments and symptoms, and in the evaluation of the evidence.

The Social Security Administration removed obesity from the Listing of Impairments

effective October 25, 1999. 64 Fed. Reg. 46,122 (1999). Currently, Social Security Ruling (SSR)

02-1p, outlines the evaluation of disability in regards to obesity. SSR 02-1p acknowledges that

obesity can play a role in equaling a "Listing" or "Listed Impairment" under the Social Security

16

Act. Adjudicators and judges should consider the cumulative effects not only when considering whether a claimant's impairments meet or medically equal the Listings but also when assessing residual functional capacity. See, 20 C.F.R. Pt. 404 Subpt. P, App. 1 foll § 404.1599. (West 2002) of the Listing of Impairments. Obesity at any level in the disability application process, because it is a medically determinable impairment, must be considered in assessing a residual functional capacity (RFC) of the claimant. *See*, SSR 02-1p, 20 C.F.R. §404.1523.

When assessing Claimant's RFC, the ALJ noted that Claimant had a history of obesity, and then considered his obesity in combination with his other impairments (Tr. at 62-66). The ALJ discussed Claimant's weight. Claimant weighed 410 pounds and stood at 6 feet tall. Claimant weighed 110 pounds less "a couple of years ago," and had gained weight due to trouble walking (Tr. at 62, 86). The medical evidence, containing the results of Dr. Mumford's examination, revealed that Claimant weighed 450 pounds and was 72 inches tall (Tr. at 63. 376-377, 382).

The ALJ found that Claimant's obesity was a severe impairment, however, it did not alone or in combination, meet or medically equal the severity of one of the listed impairments (Tr. at 57-58).

<u>Residual Functional Capacity (RFC)</u>

Pursuant to SSR 96-8p, the RFC assessment "must be based on all of the relevant evidence in the case record, including the effects of treatment and the limitations or restrictions imposed by the mechanics of treatment; e.g., frequency of treatment, duration, disruption to routine, side effects of medication. *Id.* at *5. Social Security Ruling 96-8p explains that the RFC "assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities,

observations)." *Monroe v. Colvin,* 826 F.3d 176, 179–80. (4th Cir. 2016). (citing *Mascio v. Colvin*, 780 F.3d 632, 635 (4th Cir. 2015)). (quoting SSR 96-8p, 61 Fed. Reg. at 34, 478; see also *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000) (observing that the ALJ "must build an accurate and logical bridge from the evidence to his conclusion"). The Fourth Circuit has held that "[a] necessary predicate to engaging in substantial evidence review is a record of the basis for the ALJ's ruling," including "a discussion of which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence." *Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013).

In the present case, the ALJ considered Dr. Mumford's clinical findings, which did not support a more restrictive RFC or a finding that Claimant had functional limitations that would preclude him from working notwithstanding his obesity and other medically determinable impairments (Tr. at 63). The ALJ referenced Dr. Mumford's examination that revealed Claimant had ranges of motion within normal limits in the upper and lower extremities, with no evidence of pain on movement or paravertebral muscle spasm; no evidence of significant kyphosis, lordosis, or noticeable scoliosis; normal sitting and supine straight leg-raising tests; the ability to transfer from a sitting to a lying position with slight difficulty related to body habitus; the inability to sit up from a lying position with legs fully extended because of morbid obesity; the ability to perform a squat; no evidence or any acute or chronic arthritic condition; and no objective evidence of any significant mechanical problem affecting Claimant's lumbar spine (Tr. at 63, 377-380). The ALJ also explained that Dr. Mumford performed pulmonary function studies on the day of the examination that were essentially normal and offered a diagnosis of subjective history of asthma currently asymptomatic (Tr. at 63, 379-380, 384-391).

Additionally, the ALJ explained that Dr. Hawkins, a treating physician who was well aware of Claimant's obesity, performed a number of physical examinations that did not suggest a more restrictive RFC or the inability to work (Tr. at 64). The ALJ specifically referred to the results of examinations performed by Dr. Hawkins in November 2014, February 2015, and May 2015, which revealed that despite Claimant's obesity with a BMI of 52, he had a normal gait, his spine was normal, he had normal motor strength in all of his extremities and he had normal knee strength (Tr. at 64-65, 542, 544, 549, 551, 561-63, 586-87).

Consistent with Drs. Mumford's and Hawkins' clinical findings, the ALJ considered the results of objective diagnostic studies, including normal x-rays of the lumbar spine taken on March 27, 2014, and a September 13, 2014, MRI of the lumbar spine which showed no lumbar disc herniation (Tr. at 64, 446, 641).

The ALJ gave great weight to the opinion of the state agency physician Dr. Wheeler as the opinion was based on a thorough review of the medical records and a comprehensive understanding of agency rules and regulations (Tr. at 66, 127-130). Dr. Wheeler specifically found that Claimant's obesity was a severe medically determinable impairment that he considered along with his other impairments, both severe and nonsevere, in reducing his RFC to light exertion (Tr. at 66, 129). The ALJ incorporated the physical limitations found by Dr. Wheeler in the RFC assessment, but also included reaching restrictions in the RFC assessment based on his thorough and comprehensive review of the evidence as a whole (Tr. at 61, 127-130).

Pursuant to controlling regulations, the ALJ then used Claimant's RFC, which incorporated the limitations associated with Claimant's impairments, including his obesity, in determining that Claimant could not perform his past relevant work at step four but could perform

other work at step five of the sequential evaluation process. 20 C.F.R. §§ 416.920(e), 416.945(a).

As the foregoing discussion demonstrates, the ALJ factored Claimant's obesity into each step of the sequential evaluation process, and provided a rationale, supported by substantial evidence, in finding that Claimant's impairments, including his obesity, did not render him disabled under the Act (Tr. a t 57-68).

Accordingly, the undersigned respectfully recommends that the District Judge find that the ALJ's decision is supported by substantial evidence. The ALJ reviewed the record as a whole, assessed Claimant's impairment of obesity as required by SSR 02-1p and correctly determined Claimant's RFC.

<u>Conclusion</u>

For the reasons set forth above, it is hereby respectfully **RECOMMENDED** that the presiding District Judge **DENY** the Plaintiff's Brief in Support of Motion for Judgment on the Pleadings (ECF No. 16), **GRANT** the Defendant's Brief in Support of Defendant's Decision (ECF No. 17), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from this Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have three days (mailing/service) and then fourteen days (filing of objections) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984). Copies of such objections shall be served on opposing parties, Judge Chambers and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

Enter: July 17, 2018

_____
Dwane L. Tinsley
United States Magistrate Judge